Filed:  March 20, 1996

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

—————————

Nos. 95-1098(L)
(CA-94-563-2)

—————————

USAA,

                              Defendant - Appellant,

       versus

Royal Insurance Company of America,

                              Defendant - Appellee.

—————————

O R D E R

—————————

     The Court amends its opinion filed February 22, 1996, as
follows:

     On page 3, section 1, line 1 -- The United States Attorney's
name is corrected to read "<u>Helen F. Fahey</u>."

                              For the Court - By Direction

                              /s/ Bert M. Montague
                         —————————————————
                              Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff,

USAA,
Defendant-Appellant,

v.

ROYAL INSURANCE COMPANY OF
AMERICA,
Defendant-Appellee,                                    No. 95-1098

and

TOLLIVER GENE SWALLOW; THE
HERTZ CORPORATION; RENT-LEASE,
INCORPORATED,
Defendants.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

ROYAL INSURANCE COMPANY OF
AMERICA,
Defendant-Appellant,                                    No. 95-1128

and

TOLLIVER GENE SWALLOW; USAA;
THE HERTZ CORPORATION; RENT-
LEASE, INCORPORATED,
Defendants.

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.

No. 95-1296

TOLLIVER GENE SWALLOW; USAA;
THE HERTZ CORPORATION; RENT-
LEASE, INCORPORATED; ROYAL
INSURANCE COMPANY OF AMERICA,
Defendants-Appellees.

Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
William T. Prince, Magistrate Judge.
(CA-94-563-2)

Argued: December 7, 1995

Decided: February 22, 1996

Before WILKINSON, Chief Judge, and RUSSELL and
NIEMEYER, Circuit Judges.

_____

Reversed by published opinion. Chief Judge Wilkinson wrote the
majority opinion, in which Judge Russell joined. Judge Niemeyer
wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Terry Hunter Davis, Jr., HARRIS, FEARS, DAVIS,
LYNCH & MCDANIEL, Norfolk, Virginia; James A. Gorry, III,
TAYLOR & WALKER, Norfolk, Virginia, for Appellants. Susan
Marie Sleater, Civil Division, UNITED STATES DEPARTMENT
OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Frank

2

W. Hunger, Assistant Attorney General, Helen F. Fahey, United States Attorney, Marleigh Dover, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee United States.

_____

**OPINION**

WILKINSON, Chief Judge:

Navy Captain Tolliver Gene Swallow, while acting pursuant to military orders, rented a vehicle from the Hertz Corporation and was subsequently involved in an automobile accident. The district court held that the government-Hertz contract, which provides $100,000 of insurance for government employees who rent from Hertz, did not cover Captain Swallow. We disagree. The plain language of the government-Hertz contract obligates Hertz to maintain $100,000 of insurance for a government employee renting a Hertz vehicle for government business.

I.

The United States government entered into a rental vehicle contract with the Hertz Corporation. The contract provides for certain rates and benefits to government employees who rent Hertz vehicles while on official business, including $100,000 of insurance in the event of an accident. Captain Swallow made a reservation with Hertz to rent a car in Norfolk, Virginia. As a Captain in the Navy reserves, Swallow was to report for two weeks of training at the Atlantic Fleet Combat Training Center in Dam Neck at Virginia Beach, Virginia. His orders specifically authorized "use of rental vehicle."

On June 4, 1988, Captain Swallow arrived in Norfolk and proceeded to the Hertz rental counter to pick up his vehicle. He told the counter attendant that he would be working at the Dam Neck military base for two weeks. Captain Swallow also mentioned his affiliations with the American Automobile Association and U.S. Air and expressed a desire that he receive the "best rate." Sometime during this conversation, the attendant asked for verification of Captain

3

Swallow's government affiliation, and he accordingly produced his military identification.

Captain Swallow eventually signed a Hertz rental agreement at the "affordable weekly" or "AFW" rate of $219.59 a week. While Captain Swallow's rental agreement notes his military affiliation, specifically listing the Dam Neck bachelor officer's quarters as his Virginia contact, his rate of $219.59 appears to be higher than the government's "affordable weekly" rate ($199.80) and lower than the government's ordinary rate ($222). Hertz Counter Directory, Supp. App. at 9a. Given this discrepancy, it is not entirely clear whether Captain Swallow was simply overcharged for the government "AFW" rate or whether he received some other "AFW" rate.

A few days into his Hertz rental contract, Captain Swallow was forced to vacate his room at the Dam Neck officer's quarters because the Navy would be using it for a NATO conference. As a result, Captain Swallow needed to locate off-base accommodations to fulfill his military obligations. On June 7, while Captain Swallow was using his Hertz vehicle to search for housing, he struck a motorcycle, killing its driver. A suit was subsequently brought by the driver's family. See Jeremiah John Duffy, Etc, v. Tolliver Gene Swallow, et al., E.D. Va. No. Civ-89-540-N. Pursuant to this claim, the United States certified that Captain Swallow was acting within the scope of his employment, and the district court entered a judgment in the amount of $140,000.

The United States paid the judgment and proceeded with an action for reimbursement on June 3, 1994. The central question in this action was whether Captain Swallow was covered by the $100,000 policy provided by the government-Hertz contract. If Captain Swallow was covered by this policy, Hertz would be obligated to pay $100,000 and Captain Swallow's personal insurance company, USAA, would pay the remaining $40,000. In the event of non-coverage, Hertz would be liable for only $25,000 (the minimal insurance provided to all renters), Captain Swallow's insurer, USAA, would be liable for the full amount of Captain Swallow's personal policy, $100,000, and the government would thus have to absorb the remaining $15,000. Hertz' Norfolk licensee, Rent-Lease, Inc., had obtained Hertz' insurance coverage from the Royal Insurance Company of America.

4

The reimbursement case was eventually tried before a magistrate judge. The magistrate judge agreed that Captain Swallow was acting pursuant to official government business. The magistrate judge determined, however, that Captain Swallow was not covered by the $100,000 government-Hertz contract insurance because Captain Swallow "did not make it clear to the Hertz representative that he was taking advantage of this car rental agreement that the United States Government had worked out." The result was that Hertz (through its agent's insurer, Royal) had to pay $25,000, USAA had to meet its full exposure of $100,000, and the government was ultimately left with a $15,000 difference between what it had paid to the motorcycle driver's family and what it had recovered from the insurance companies. This appeal ensued.

II.

A.

The issue here is whether federal employees who rent vehicles from Hertz while travelling on official business are entitled to $100,000 of insurance coverage under the terms of the government's contract with Hertz. "When interpreting contracts, courts are compelled to give effect to the intent of the parties, which is measured first and foremost by the language of the contract itself." Valtrol, Inc. v. General Connectors Corp., 884 F.2d 149, 152 (4th Cir. 1989) (citations omitted). The relevant provision of the government-Hertz contract states:

> The Hertz Corporation shall maintain in force, at its sole cost or provide as a duly qualified self-insurer, insurance coverage for the United States Government, its employees, and any additional operators authorized under the terms of the Rental Agreement against liability for bodily injury, including death and property damage arising from the use of the vehicle as permitted by this Agreement with limits of at least $100,000 for each person for each accident or event . . . .

This contract unambiguously obligates Hertz to provide $100,000 of insurance to a government employee who rents from Hertz on govern-

5

ment business. The purpose of the contract is just as evident: to have insurers indemnify the United States for torts committed by its employees in rented cars.

Here, there is no doubt that Hertz rented a vehicle to a government employee on official business. Captain Swallow left his home in California and flew to Norfolk, Virginia, under orders from the Navy to report to the Atlantic Fleet Combat Training Center in Dam Neck for two weeks of training. His orders specifically authorized "travel at own expense subject to reimbursement" and "use of rental vehicle in execution of these orders." And on the night of the accident, Captain Swallow was in the process of securing off-base housing so that he could continue his training.[1]

So too should the Hertz attendant have recognized that Captain Swallow was renting a car pursuant to government business. Upon arrival at the counter in Norfolk, Captain Swallow presented his United States military identification to the attendant and explained that he would be at the Dam Neck military base for two weeks. The counter clerk even listed the "Dam Neck BOQ" (bachelor officer's quarters) on the rental agreement.[2]

Royal contends that none of this matters; in its view its coverage obligations only arise when the traveller receives a particular government rate, regardless of whether he is a government employee travelling on official business. The magistrate judge apparently agreed with this interpretation of the contract. After noting Swallow's testimony that he told the clerk he would be in military school for two weeks with the Navy, the magistrate judge nonetheless held that Swallow

_____

[1] Royal Insurance argues that Captain Swallow was not travelling within the scope of duty on the night of the accident. We reject this argument. The magistrate judge found that "[t]he government instructed [Swallow] to vacate the housing that [the government] had made available to him and instructed him to find other housing and the accident occurred while he was actively seeking the other housing." This finding is supported by the record.

[2] We thus need not ask in this case whether the contract places an obligation on the traveller to disclose his government status or on the company to inquire as to it.

was not covered under the contract because he had wanted "to rent a car at the best rate."

Nothing in the contract, however, forbids a government employee from seeking to rent at the most economical rate. Moreover, nothing in the language of the contract indicates that Royal's coverage obligations arise only when a government employee receives a government rate. "Implied covenants are disfavored, and must clearly arise from the language used, or be indispensable to effectuate the intent of the parties." Valtrol, 884 F.2d at 152. Nowhere does the contractual language make the $100,000 insurance coverage contingent upon acceptance of a particular rate; nor is Royal's interpretation essential to the existence of a rental contract between the government and Hertz.

The contract, in fact, does attach a condition based on acceptance of a particular rate to a different rental benefit, the Loss Damage Waiver ("LDW"). LDW protects a renter from liability for the rented vehicle's loss or damage: "Government travelers on official business and paying the rates as defined in paragraph 1 will not be subject to any fee for Loss Damage Waiver" (emphasis added). This clause plainly does not apply to liability insurance as"LDW IS NOT INSURANCE." Hertz Rental Agreement, Supp. App. at 6a. If the parties had intended for a similar rate-based condition to attach to the $100,000 liability insurance provision, surely they would have used such language in describing the terms of that coverage.

B.

Finally, Royal's interpretation would spawn additional litigation, as parties involved in accidents would dispute obscure rate codes and line items on rental agreements in an attempt to prove that a government employee either did or did not receive a particular rate. Hertz government rates alone include five classes of vehicles, three adjustments based on the length of time that a vehicle is rented, and discounts for "Affordable Daily rates," "Affordable Weekly rates," "Affordable Weekend rates," and "Economy rates." Hertz Counter Directory, Supp. App. at 9a. Similarly complicated rate structures appear to exist for various other groups as well as the public in general. In practice, it may be difficult to determine what rate was received by a particular renter.

7

Such was the case here. Captain Swallow's rental agreement noted merely that he had received an "AFW" or "affordable weekly rate." It appears, however, that Hertz offers numerous "AFW" rates. As a result, we heard extensive argument about whether Captain Swallow's rate was an "AFW" rate available to the general public, a government "AFW" rate, or perhaps, some other "AFW" rate. To this day, after extensive litigation, it is still not entirely clear what category of rate Captain Swallow received. The only way to avoid these messy inquiries is to interpret the contract's insurance as applying to any government employee who rents a Hertz vehicle on official business, regardless of the rate that he receives. The contract makes clear that this is the coverage for which the government paid and bargained, and this is what it shall receive.

III.

For the foregoing reasons, we hold that the government-Hertz contract obligates Hertz to provide $100,000 of insurance coverage for federal employees who rent Hertz vehicles on official business, that Royal, as Hertz' insurer in this case, owes the government $100,000, and finally, that Captain Swallow's insurer, USAA, owes the residual $40,000. The judgment of the district court is accordingly reversed.

REVERSED

NIEMEYER, Circuit Judge, dissenting:

Under an automobile rental contract between the United States government and The Hertz Corporation, Hertz agreed to rent automobiles to the government and its employees while on official business for a specified rental rate and to provide the person renting the automobile with $100,000 insurance coverage. In this case, a government employee rented an automobile from Hertz, but not under the Hertz-government contract rate. The employee asked for, and was given a lower weekly rate Hertz established for the public, which included only $25,000 insurance coverage. Nevertheless, the majority holds that Hertz must provide $100,000 of insurance coverage under the Hertz-government contract because the employee was on government business. In doing so, the majority ignores express terms in the rental agreement between Hertz and the government employee and imposes

8

unassumed risks on Hertz. Respectfully, I cannot agree with such a holding.

The facts, established by findings of the magistrate judge, are not challenged on appeal. Counsel confirmed as much at oral argument. Tolliver Gene Swallow, a captain in the Naval Reserve, resided in California and worked in civilian life as a pilot for USAir. He received orders from the Navy to serve his two-week reserve officer summer training at Dam Neck, Virginia, in June 1988. His orders authorized him to obtain housing and a rental car for the two-week period.

After receiving his orders, Captain Swallow called Hertz and reserved an automobile for pick up at the Norfolk International Airport. When he arrived at the Hertz counter in Norfolk, Captain Swallow requested the "best available" rental rate, discussing discounts through AAA and USAir. He indicated that Hertz had an "outstanding program for USAir employees," and this is why he rented from Hertz. During his conversation with the Hertz sales representative, Captain Swallow mentioned that he was in Norfolk with the Navy to attend military school. The Hertz representative rented Swallow a full-size automobile under the "AFW" ("Affordable Weekly") rate of $219.59 per week, purportedly the lowest rate available to Swallow.

While Hertz had an agreement with the government under which it agreed to rent the same full-size automobile to government employees for $222 per week, Captain Swallow did not ask for, nor did the Hertz representative give him, the government rate. The magistrate judge explicitly found: "Swallow did not identify himself as traveling under the government orders, that is, the military orders; nor did he seek the government rate." The magistrate judge also found that the Hertz sales representative did not rent Swallow the vehicle under the government rate. Thus, he concluded: "I am finding that in this case there was no rental agreement reached between Mr. Swallow and [Hertz] that was entered into under this [Hertz-government contract]."

The record establishes not only that the "AFW" and government rates were different, but also that each rate included different benefits. The AFW rate, which was the lower rate, only included, for example, $25,000 of insurance coverage. On the other hand, the government

9

rate included $100,000 of insurance coverage. Moreover, the two rates had different daily charges if the vehicle was returned before the expiration of a week. After the accident in this case, when Swallow returned the damaged vehicle before having used it for an entire week, he was charged a daily rate of $50, which is the amount chargeable under the "AFW" rate. The government daily rate would have been $37.

Even though Swallow did not rent under the government rate, the majority would have Hertz and its insurer provide Swallow with the benefits of the government rate. The logic implied by the holding is that when any government employee rents a vehicle, even if he says "I do not want to rent under the government contract," Hertz must insist on charging the employee the government rate in order to recoup the cost of providing the benefits included in that rate.* This notion violates fundamental principles of contract law by dishonoring the will of the parties to the actual rental agreement. I submit that it also abandons common sense.

The majority relies on the contract provision which obligates Hertz unconditionally to provide $100,000 of insurance to the government and its employees who rent from Hertz. It concludes in essence that this agreement is an insurance contract, providing insurance to all government employees using Hertz rental vehicles, regardless of the circumstances of each rental agreement. This reading, I believe, fails to acknowledge all of the terms of the contract.

The terms of the Hertz-government contract are set forth in a five-page, single-spaced document that includes rates, benefits, and conditions. It begins, "The Hertz Corporation agrees to the terms and con-

_____

* Hertz obtained its insurance from Royal Insurance Company, and Hertz agreed to pay premiums based on "actual exposures." The insurance contract provided that the premium "shall be upon a rate applied to each Rental." Even though such premiums would have to be based on data about persons renting under the Hertz-government contract, the majority renders that calculation impossible when it concludes that Hertz agreed to provide such insurance "to any government employee who rents a Hertz vehicle on official business, regardless of the rate he receives." (Emphasis added).

10

ditions set forth in this agreement and offers the following vehicle rental rates." That language clearly connects benefits with rates. In addition, the contract specifies that "rates do not include . . . Personal Accident Insurance and Personal Effects Coverage." But it does state that Hertz will provide $100,000 liability insurance in connection with the "use of the vehicle as permitted by this Agreement." Finally, the contract provides, "It is understood that the Government and its employees are not obligated to purchase any services offered by The Hertz Corporation under the terms of this agreement." And indeed, as the magistrate judge found, Captain Swallow did not purchase the benefits and conditions provided under that contract.

The common sense reading of the Hertz-government contract leads to the conclusion that for the quoted rates, Hertz agreed to provide the stated benefits, including $100,000 of insurance coverage. If a government employee refuses to pay the rate, but instead invokes some other lower rate, it follows that the employee does not get the benefits agreed to between the government and Hertz.

I would thus affirm the judgment of the district court, and accordingly I dissent.

11